UNITED STATES DISTRICT COURT                b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

GREGORY BARNES                    CIVIL ACTION 1:16-CV-01769

VERSUS                            JUDGE TRIMBLE

U.S. COMMISSIONER, SOCIAL         MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION

---

## REPORT AND RECOMMENDATION

### I.    Background

#### A.    Procedural Background

Gregory Barnes ("Barnes") filed an application for disability insurance benefits ("DIB") alleging a disability onset date of January 27, 2014 (Doc. 5-1, p. 117/736) due to degenerative disc and joint disease, traumatic brain injury, and post-traumatic stress disorder (Doc. 5-1, p. 137/736).  That application was denied by the Social Security Administration ("SSA") (Doc. 5-1, p. 63/736).

A *de novo* hearing was held before an Administrative Law Judge ("ALJ") at which Barnes appeared with his attorney and a vocational expert ("VE") (Doc. 5-1, p. 28/736).  The ALJ found that, although Barnes suffers from severe impairments of degenerative disc and joint disease, traumatic brain injury, and post-traumatic stress disorder (Doc. 5-1, p. 17/736), he has the residual function capacity to perform light work except that he cannot do any overhead lifting, cannot do complex tasks, and can have only occasional interaction with the public (Doc. 5-1, p. 20/736).  The ALJ further found that work exists in significant numbers in the nation economy that Barnes can

do, such as routing clerk or mailroom clerk (Doc. 5-1, p. 24/736).  The ALJ concluded that Barnes was not disabled from January 27, 2014 though the date of his decision on July 25, 2016 (Doc. 5-1, p. 24/736).

Barnes requested a review of the ALJ's findings, but the Appeals Council declined to review it (Doc. 5-1, p. 4/736), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Barnes filed this appeal for judicial review of the Commissioner's final decision. Barnes raises the following grounds for relief on appeal (Doc. 10):

1. The ALJ failed to consider all the evidence, especially the complete testimony of the VE.

2. The Appeals Council erred in failing to consider the appeal, which was supported by additional evidence regarding PTSD and its effect on claimant's ability to work.

The Commissioner responded to Barnes's appeal (Doc. 11).  Barnes's appeal is now before the Court for disposition.

## B.   <u>Medical Records</u>

Barnes was evaluated by Dr. Brad J. Chauvin, an orthopedic surgeon, in March 2014 for left shoulder pain (Doc. 5-1, p. 240/736).  Barnes complained of constant left shoulder pain that had increased in the last two months (Doc. 5-1, p. 240/736). Barnes suffered a parachute injury in 1999 and a car accident in 2000, which injured his neck, shoulder, and back (Doc. 5-1, p. 377/736).   Barnes said his shoulder starts to hurt when he moves it, then the pain moves down to his hand and all fingers, without numbness or tingling (Doc. 5-1, p. 240/736).   A two-year-old MRI showed a full-thickness supraspinatus tendon tear, biceps tendinitis, and a partial subscapular

tear (Doc. 5-1, p. 241/736). Dr. Chauvin diagnosed rotator cuff sprain and strain, shoulder pain, rotator cuff syndrome of the shoulder, partial tear of the rotator cuff, compete rupture of the rotator cuff, pain in the forearm and joint, disorder of the bursae and tendons in the shoulder region, and non-traumatic rupture of tendons of the biceps (long head), with left shoulder pain and possible radiculopathy (Doc. 5-1, p. 241/736).

Barnes sought medical care and benefits from a VA Medical Center in July 2014 (Doc. 5-1, pp. 563, 571/736). Barnes reported chronic shoulder pain since 2002, he was found to be a high risk for falling, his PTSD screen was positive, his traumatic brain injury ("TBI") screen was positive, and his depression screen suggested moderate depression (Doc. 5-1, pp. 570, 572-75/736). Barnes was diagnosed with controlled hypertension, hyperlipidemia, lower back pain, joint pain, intermittent tinnitus, traumatic brain injury, and post-traumatic stress disorder ("PTSD") (Doc. 5-1, p. 568/736).

Barnes's July 2014 PTSD screen showed he was a widower with grown children (Doc. 5-1, pp. 345/736). Barnes served in the Navy from 1986 through 2007, in the Persian Gulf, OEF, IOF era (Doc. 5-1, p. 347/736). His title was Engineman, but he performed bomb patrol duty, served overseas, and received hazardous duty pay 5 times (Doc. 5-1, p. 345/736). Barnes suffered a parachute injury in 1999 and a car accident in 2000 with injuries to his neck, shoulder, and back (Doc. 5-1, p. 377/736). Barnes stated he was involved in several instances where death or fear for his life were imminent; he had intrusive experiences such as recurrent thoughts,

nightmares, and physiological reactions to triggers; he did not want to think, talk about, or go places that remind him of the trauma; and he had persistent and exaggerated negative beliefs about the world, persistent negative emotional states, mood associated symptoms, or marked diminished interest in significant activities, feelings of detachment from others, and persistent inability to experience positive emotions (Doc. 5-1, p. 347/736).  Barnes exhibited irritability, hypervigilance, and sleep disturbances (Doc. 5-1, p. 347/736).  Barnes was diagnosed with chronic PTSD (as evidenced by trauma, war time recollections, and impairment in life activities for more than one month) (Doc. 5-1, p. 348/736).  In September 2014, Barnes was prescribed Trazodone for insomnia and Prazosin for nightmares (Doc. 5-1, pp. 406-09/736).

A CT scan of Barnes's brain in July 2014 was normal (Doc. 5-1, p. 289/736). Barnes was found to be suffering from bilateral tinnitus in August 2014 (Doc. 5-1, p. 343/736).

In September 2014, Barnes reported frequent left shoulder pain; cervical pain (C6 herniation) with left arm radiculitis, intermittent numbness, and weakness of the left hand and thumb; headaches; insomnia; memory issues; frequent nightmares; PTSD; hypertension; right foot numbness; left knee pain; arthritic changes; left elbow pain; and tinnitus (Doc. 5-1, pp. 516-17/736).  Barnes reported that his left knee would go out on him while standing (Doc. 5-1, p. 510/736).  Barnes's left knee pain was believed to be caused by an ACL injury during parachute jumps, and he was given a knee brace and a TENS unit (Doc. 5-1, pp. 322, 332/736).

X-rays of Barnes's cervical spine in September 2014 showed moderate narrowing of the C6-7 disc space, mild anterior spurring of C5-C7, and narrowing of the left C6 exit foramen was suggested, but there was no evidence of cervical spine instability on flexion or extension (Doc. 5-1, p. 232/736).

Electromyography and nerve conduction studies in September 2014 showed no clear weakness in the upper extremities, no neurological symptoms, and normal motor strength, but shoulder pain on abduction and adduction of his left arm (Doc. 5-1, p. 233-34/736). There was no evidence of neuropathy, carpal tunnel syndrome, ulnar neuropathy, or blockage at the elbow, and very mild nonspecific irritability at C5-6 bilaterally (Doc. 5-1, p. 234/736).

In October 2014, Barnes reported increased chronic left knee pain (Doc. 5-1, p. 317/736).   Barnes' knee was not swollen and there was no edema (Doc. 5-1, p. 489/736), but he had weakness in his gait and on transferring, and was at a high risk for falls (Doc. 5-1, p. 499/736).   Barnes reported his knee pain limited comfort, sleep, and activity (Doc. 5-1, p. 494/736).  Meloxicam helped reduce the pain (Doc. 5-1, p. 494/736).

Also in October 2014, Barnes finished cognitive behavioral therapy for insomnia (Doc. 5-1, pp. 483-84, 487-88, 502, 505, 509, 513-15/736).  Barnes's sleep efficiency improved; his insomnia severity index improved from severe clinical insomnia to moderate; his Beck Depression Scale II decreased from 34 (severe) to 23 (moderate); and he fell asleep faster, awakened less, and woke early less often (Doc. 5-1, pp. 483-84/736).

In November 2014, Barnes was diagnosed with chronic PTSD and insomnia at Axis I[1] (Doc. 5-1, p. 475/736).  Hyper-alertness was one of his main problems (Doc. 5-1, p. 475/736).  Barnes had multiple concussions during deployments in the Navy, one of which resulted in loss of consciousness (Doc. 5-1, p. 477/736).  Barnes suffered from headaches, poor concentration, forgetfulness, difficulty sleeping, anxiety, and irritability (Doc. 5-1, p. 477/736).

X-rays of Barnes's lumbar spine in November 2014 showed degenerative changes in the lower lumbar spine and anterior wedging of the L1 (Doc. 5-1, p. 258/736).  A nerve root block in December 2014 at L5 right made Barnes's pain tolerable at 3/10, with tolerable intermittent discomfort radiating into the right lower extremity (Doc. 5-1, pp. 254, 256/736).  Barnes was prescribed Mobic (Doc. 5-1, p. 254/736).  Barnes's neurological and lumbosacral exams were normal, his gait was normal, there were no paraspinal muscle spasms, and the motor strength in his upper extremities was normal (Doc. 5-1, p. 255/736).  Barnes was prescribed Lisinopril for his hypertension, which was stable (Doc. 5-1, p. 468-49/736).  It was noted that pain in his left elbow restricted extension sometimes, and that he had previously been

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM- IV-TR").  In the more recent fifth edition DSM-V, a non-axial system of evaluation was adopted.  See Diagnostic and Statistical Manual of Mental Disorders, p. 16 (5th ed. 2013).

offered surgery (Doc. 5-1, p. 468/736).  Barnes reported that pain affected his physical activities, sleep, and walking (Doc. 5-1, p. 472/736).

Barnes had several MRIs in January 2015: Barnes's lumbosacral spine showed anterior wedging of L1 and mild spondylosis at L1 (Doc. 5-1, p. 287/736); his right and left elbows were normal (Doc. 5-1, pp. 284, 286/736); his right shoulder showed post-operative changes (Doc. 5-1, pp. 285-86/736); his left shoulder was normal (Doc. 5-1, p. 288/736); and his right knee was normal (Doc. 5-1, pp. 283-84/736).  Barnes injured his left knee when he was a paratrooper (Doc. 5-1, p. 283/736), and he complained of left knee pain that was sharp on rotation and instability (Doc. 5-1, pp. 365-66/736).  A February 2015 MRI showed chondromalacia patellae (Doc. 5-1, pp. 283-84, 414/736).

A sleep evaluation in March 2015 indicated Barnes suffers from obstructive sleep apnea, and a CPAP machine was recommended (Doc. 5-1, pp. 308-9/736).

In March 2015, Barnes had a neurological exam with Dr. Michael L. Drerup, a neurological surgeon, for his complaints of chronic cervical pain, radiating left shoulder pain, and left upper extremity numbness, tingling, and weakness (Doc. 5-1, p. 248/736).  Dr. Drerup noted disc protrusion with osteophyte formation at C6-7 left, foraminal stenosis, and mild C5-6 irritability with no radiculopathy. (Doc. 5-1, p. 252/736).  Dr. Drerup diagnosed a cervical herniated nucleus pulposis and cervical spondylosis without myelopathy (Doc. 5-1, p. 232/736), which caused: (1) chronic mechanical low back pain secondary to supraspinatus/infraspinatus ligamentous syndrome L3-4 (nearly resolved with a block at L3-4); (2) L5 radiculopathy secondary

to foraminal stenosis L4-6 and L5-S1 (improved with a block at L5 right); and (3) chronic intrascapular pain with cervical radiculopathy left, secondary to lateral disc protrusion with osteophyte formation C6-7 left, somewhat improved with blocks at C7 left (Doc. 5-1, p. 252/736).  Dr. Drerup recommended repeat nerve root blocks (Doc. 5-1, p. 252/736).

In April 2015, Barnes complained that, despite taking his pain medication, he had constant, chronic pain: "shooting" pain in his neck; dull pain in his back; "ripping, pulling, tearing" pain in his shoulder; popping and cracking in his elbow; and "ripping" pain in his knee (Doc. 5-1, p. 400/736).  Physical activity caused the pain, which limited his activities (Doc. 5-1, p. 400-01/736).  Barnes had a cervical nerve root block of the left C6 and C7 for treatment of radiculopathy (Doc. 5-1, p. 247/736).

In June 2015, Barnes underwent a sleep study and was diagnosed with sleep apnea by Dr. Gerald Foret (Doc. 5-1, pp. 314, 403-04/736).  Barnes was issued a CPAP machine (Doc. 5-1, p. 392/736).

Also in June 2015, Barnes reported constant pain for the last week in his neck, lower back, left shoulder, left elbow, and left knee (Doc. 5-1, pp. 370-71/736).  Barnes stated the pain began in after a car accident, and increased with activity (Doc. 5-1, p. 371/736).  Barnes underwent physical therapy for his left knee (Doc. 5-1, pp. 375-76/736).  Barnes's history was noted: (1) cervical radiculopathy secondary to lateral disc protrusion with osteophyte formation C6-7, and a cervical nerve root block had been given in October 2014; (2) chronic low back pain secondary to supraspinatus infraspinatus ligamentous syndrome that had been treated with a nerve block; (3) L5

8

radiculopathy secondary to foraminal stenosis L4-5 and L5-S1 that had been treated with a root block at L5 right; and (4) left knee pain caused by chondromalacia patellae, for which he was currently doing physical therapy (Doc. 5-1, p. 377/736).  At that time, Barnes had equal muscle strength bilaterally; normal gait and posture; a mild limitation in the neck range of motion; a limitation in his left shoulder range of motion; and his mood, insight, and judgment appeared to be normal (Doc. 5-1, p. 377/736).  Barnes was diagnosed with: (1) chronic arthralgia of the left shoulder, left elbow, and left knee, for which he was referred for continued joint injections; and (2) cervical radiculopathy (last injection was in April 2015) (Doc. 5-1, p. 378/736).

Barnes completed cognitive processing therapy for PTSD in 2015 (it began in July 2014) (Doc. 5-1, pp. 353-365, 367-68, 373-74, 389-91, 395-97,405-07, 478-80, 485-86, 506-07, 511-12, 536-38/736).  In June 2015, Barnes reported he was feeling pretty good (Doc. 5-1, p. 367/736).  Barnes was taking Trazosin and Trazodone, sleeping four and a half to five hours per night with nightmares three times per week, his mood was "alright," he had not had a flashback in the last week, and he did not have anhedonia, depression, panic attacks, irritability, or aggravation (Doc. 5-1, p. 367/736).  Barnes was medication-compliant and had an adequate support system (Doc. 5-1, p. 367/736).  Barnes's diagnoses were PTSD, TBI with loss of consciousness, and insomnia (Doc. 5-1, p. 368/736).  Barnes scored a 60 on his PTSD assessment in June 2015, reporting repeated disturbing memories, thoughts or images, and dreams of the stressful experience, having a lot of trouble falling or staying asleep, feeling extremely super-alert or on guard, and moderate difficulties in most other areas (Doc.

9

5-1, pp. 385-86/736).  Barnes stated these problems made it very difficult for him to do work, take care of things at home, and get along with other people (Doc. 5-1, p. 386/736).

Also in June 2015, Barnes had chondromalacia (grade 3) patellae that needed strengthening and training to decrease his pain (Doc. 5-1, p. 387/736).  Barnes reported his knee pain was a 5/10 at rest (Doc. 5-1, p. 388/736).  Barnes was instructed to do physical therapy (stretching and strengthening) at home (Doc. 5-1, p. 388/736).

In June and July 2015, the Veterans' Association ("VA") gave Barnes an 80% service-connected disability for paralysis of the sciatic nerve, degenerative arthritis of the spine, limited arm motion, limited extension of the forearm, bursitis, and limited flexion of the knee (Doc. 5-1, pp. 298-99/736).

In June 2015, Barnes was evaluated for PTSD benefits by Kathryn Kelly, Ph.D. in June 2015 (Doc. 5-1, p. 725/736).  Barnes served in the military for 21 years, with 7 deployments, 7 temporary duty assignments, and an honorable discharge, and worked as a diver and doing explosive ordinance disposal (Doc. 5-1, pp. 729-30/736). After his discharge, Barnes worked for a government contract company for 7 years, but the job culminated in daily verbal altercations with coworkers, supervisors, and customers, so Barnes left and moved back to Louisiana (Doc. 5-1, pp. 729, 73, 735/736).  Barnes was diagnosed with moderate PTSD (Doc. 5-1, pp. 725, 735/736).  It was noted that Barnes had been diagnosed with TBI in August 2006, and that his PTSD and TBI symptoms overlapped significantly (Doc. 5-1, p. 726/736).  Barnes's symptoms were depressed mood; anxiety; suspiciousness; chronic sleep impairment;

mild memory loss; disturbances of motivation and mood; difficulty establishing and maintaining effective work and social relationships; inability to establish and maintain effective relationships; suicidal ideation; obsessional rituals that interfere with routine activities; and impaired impulse control (such as unprovoked irritability with periods of violence) (Doc. 5-1, p. 735/736).

In August 2015, a psychiatric review technique form was filled out by Paul Cherry, Ph.D, a non-examining consultant (Doc. 5-1, pp. 54-55/736). Dr. Cherry noted that Barnes was a 47 year-old combat veteran who had lost consciousness in 2005 when an IED exploded near where he was working (Doc. 5-1, p. 54/736). Dr. Cherry found Barnes suffers from anxiety-related disorders that cause mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, but no episodes of decompensation (Doc. 5-1, p. 55/736). Dr. Cherry added that Barnes has PTSD with flashbacks, social isolation, sleep problems, nightmares, and a restricted affect (Doc. 5-1, p. 55/736). Dr. Cherry further found Barnes has a moderately limited ability to understand and remember detailed instructions due to his PTSD, but can perform simple tasks in order to take care of activities of daily living; has a moderately limited ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; has a moderately limited ability to work in coordination with or in proximity to others without being distracted by them; has a moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to

perform at a consistent pace without an unreasonable number and length of rest periods due to PTSD and social isolation; has a moderately limited ability to interact appropriately with the general public; has a moderately limited ability to accept instructions and respond appropriately to criticism from supervisors; and has a moderately limited ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Doc. 5-1, pp. 58-59/736).   Dr. Cherry concluded that Barnes should be capable of simple, routine work in a more isolated setting (Doc. 5-1, p. 59/736).

In September 2015, Barnes's left knee was aspirated and Euflexxa was injected (Doc. 5-1, p. 630/736).  Barnes was also given an injection of Medrol and Marcaine in his left shoulder (Doc. 5-1, p. 630/736).  Barnes was issued a tennis elbow splint for his left elbow (Doc. 5-1, p. 633/736).

In October 2015, Barnes had left knee effusion (Doc. 5-1, p. 628/736).  His knee was again aspirated and Euflexxa was injected (Doc. 5-1, p. 628/736).

In October 2015 through January 2016, Barnes was counseled for his PTSD (Doc. 5-1, pp. 596-97, 605, 620, 626/736).  Barnes was a low suicide risk (Doc. 5-1, pp. 597, 605, 620/736).

In November 2015, with the addition of a diagnosis of sleep apnea, the VA gave Barnes a 100% disability rating (Doc. 5-1, pp. 200-201/736).

An MRI and arthrogram of Barnes' shoulder in December 2015 showed a large SLAP tear extending from anterior inferior to posterior superior; tendinosis in the supraspinatus and intraspinous tendons; tendinosis in the subscapularis tendon; and

AC joint arthropathy with mechanical impingement (Doc. 5-1, p. 578-81/736).  Barnes was offered surgery (Doc. 5-1, p. 598/736).  Barnes was referred for occupational therapy, but his prognosis was guarded due to the severity of his injuries, and it was noted he would probably have surgery in January (Doc. 5-1, pp. 600-601/736).  Barnes agreed to a referral to Houston for surgery evaluation, labral repair, and subacromial decompression (Doc. 5-1, p. 603/736).

In May 2016, Barnes underwent an arthroscopic left shoulder rotator cuff debridement and left open biceps tenodesis (Doc. 5-1, p. 656/736).  By June, Barnes was not using pain medications, was using a regular sling, and was healing well (Doc. 5-1, p. 656/736).

C.    <u>**Administrative Hearing**</u>

At his June 2016 administrative hearing, Barnes testified that he was 48 years old, right handed, 6 feet tall, weighed 210 pounds, and had lived by himself for the last two years (Doc. 5-1, p. 33/736).  Barnes has income from the VA (Doc. 5-1, p. 33/736).

Barnes completed high school, has specialized training from the Navy in bomb disposal, and can read, write, and do math (Doc. 5-1, p. 34/736).  Barnes's rank when he left the Navy was Senior Chief, E-8 (Doc. 5-1, p. 35/736).  Barnes supervised 4 to 5 people as a Senior Chief (Doc. 5-1, p. 35/736).  Barnes was a diver before he joined the Explosive Ordinance Disposal ("EOD") unit (Doc. 5-1, p. 35/736).   After leaving the Navy, Barnes did engineering consultant work concerning managing equipment and disposing of unexploded ordinance, from 2007 through 2014 (Doc. 5-1, p. 35/736).

For his civilian work, Barnes had to keep records and fill out reports (Doc. 5-1, pp. 35-36/736). Barnes worked overseas and had to worry about security, water, food, lodging, employers, and transportation (Doc. 5-1, p. 46/736). All of Barnes's work, including equipment management, involved bomb disposal (Doc. 5-1, p. 47/736).

Barnes suffered brain injury from an IED[2] in 2006 (Doc. 5-1, p. 45/736). Barnes testified that he can no longer work due to: TBI that affects his mental capabilities; PTSD that includes flashbacks, nightmares, and anxiety; and sleep apnea (Doc. 5-1, p. 36/736). Job stress prevents Barnes from doing contracting work (Doc. 5-1, p. 41/736). Anxiety also affects Barnes's ability to work (Doc. 5-1, p. 46/736).

Barnes testified he injured his shoulder when he parachuted into Albania (Doc. 5-1, p. 36/736). Barnes recently had shoulder surgery and will have physical therapy when his surgeon permits it (Doc. 5-1, p. 36-37/736). Barnes testified the surgery should relieve some of his shoulder pain, but he will have a 20 to 50 percent loss of mobility in raising his left arm (Doc. 5-1, p. 37/736). A friend will drive Barnes to Houston for his follow-up appointment (Doc. 5-1, p. 37/736).

Barnes testified that he drives an automatic truck (Doc. 5-1, pp. 33-34/736). Barnes drives once or twice per week to the grocery store or to dump trash (Doc. 5-1, p. 38/736). Barnes is able to carry light bags with his right hand (Doc. 5-1, p. 38/736). Barnes is currently taking hydrocodone for pain, as well as injections (a steroid and anti-inflammatory mixture) in his neck, back, knee, and elbow (Doc. 5-1, p. 38/736).

---

[2] Improvised Explosive Device.

Barnes testified the knee, shoulder, and elbow injections are about every three months, while the lower back and neck injections are about once a year (Doc. 5-1, p. 38/736).

Barnes testified that he intends to take care of his physical and mental health first (Doc. 5-1, p. 41/736). Barnes has limited mobility in his neck, so he cannot pick things up and he gets migraines (Doc. 5-1, p. 43/736). Barnes's lower back pain causes numbness in his lower legs and toes; limits his ability to bend over; and affects his stamina (Doc. 5-1, p. 43/736). The numbness is in both feet, both big toes, and both second toes, so he has to wear shoes (Doc. 5-1, p. 43/736). Barnes had a prior surgery on his right shoulder in 2006 to repair torn tendons, but still has a limited range of motion in that shoulder that affects his ability to reach (Doc. 5-1, p. 44/736). Barnes has arthritis in his left elbow, and cannot extend or bend his arm fully (Doc. 5-1, p. 45/736). Barnes' left knee is missing cartilage (Doc. 5-1, p. 45/736).

Prior to his shoulder surgery, Barnes could mow the lawn a little, but now a friend usually mows it (Doc. 5-1, p. 39/736).

Barnes testified he still gets mental health treatment for his PTSD at the VA once a month (Doc. 5-1, p. 39/736). Sometimes he drives himself to his appointments (Doc. 5-1, p. 39/736). Barnes admitted he has trouble getting along with people sometimes, but it has never resulted in legal problems or problems with the police (Doc. 5-1, p. 39/736).

Barnes testified that he drinks "very occasionally" (Doc. 5-1, p. 40/736). He does not do anything social through organizations or church (Doc. 5-1, p. 40/736).

Barnes has two daughters who live in Virginia that he has seen once in the last two and a half years (Doc. 5-1, p. 40/736). Barnes likes to fish from a boat, but has not been fishing in two and a half years (Doc. 5-1, p. 408/736). Barnes uses a friend's computer sometimes (Doc. 5-1, p. 41/736).

The VE testified that Barnes's past work: (1) in bomb disposal was medium work, SVP 6, DOT 632.261-018; (2) as a diver was medium work, SVP 7, DOT 899.261-010; and (3) as an equipment specialist was heavy work, SVP 7, DOT number 638.281-014 (Doc. 5-1, p. 48/736).

The ALJ posed a hypothetical to the VE involving a person of Barnes's age, education, and work experience, who can lift 20 pounds occasionally and 10 pounds frequently, can walk/stand for six hours, sit for six hours, cannot do any overhead work, cannot do complex work but can do detailed work, and can have only occasional interaction with the general public (Doc. 5-1, p. 48/736). The VE testified that such a person can work as a routing clerk package sorter (DOT 222.687-022; light work; SVP 2; 661,500 jobs in the nation and 7,700 jobs in Louisiana), or as a mail room clerk (DOT 209.687-026; light work; SVP 2; 99,100 jobs in the nation and 749 jobs in Louisiana) (Doc. 5-1, p. 48/736).

The ALJ posed a second hypothetical involving a person with the same limitations, except he is limited to sedentary work (lift/carry 10 pounds occasionally and five pounds frequently, stand/walk for 2 hours, and sit for six hours) (Doc. 5-1, pp. 48-49/736). The VE testified that such a person could work as a polisher (DOT 713.684-038; sedentary; SVP 2; 70,000 jobs nationally and 350 jobs in Louisiana), or

16

a surveillance system monitor (DOT 379.367-010; sedentary; SVP 2; 113,000 jobs nationally and 1,300 jobs in Louisiana) (Doc. 5-1, p. 49/736).

The ALJ added the limitations of intermittent anxiety or pain that might cause the person to miss work four days of work per month (Doc. 5-1, p. 49/736). The VE testified that such a person would not be able to work at any job because employers traditionally allow only one day of sick leave per month (Doc. 5-1, p. 49/736).

### D.   ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Barnes (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is

satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In this case, the ALJ found that Barnes has not engaged in substantial gainful activity since January 27, 2014, and has severe impairments of degenerative disc and joint disease, traumatic brain injury, and post-traumatic stress disorder (Doc. 5-1, pp. 17-18/736).  The ALJ found Barnes does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 5-1, pp. 17-18/736).  The ALJ also found that Barnes is unable to perform his past relevant work (Doc. 5-1, p. 23/736).

At Step No. 5 of the sequential process, the ALJ found that Barnes has the residual functional capacity to perform light work except he cannot do overhead lifting, cannot perform complex tasks (but can do detailed work and instructions), and cannot have more than occasional interaction with the public (Doc. 5-1, p. 20/736). The ALJ found Barnes is a younger individual with at least a high school education, and transferability of work skills is immaterial (Doc. 5-1, p. 23/736).  The ALJ concluded there are a significant number of jobs in the national economy that Barnes can perform, such as routing clerk and mailroom clerk and, therefore, Barnes was not disabled as defined in the Social Security Act at any time from January 27, 2014 through the date of his decision on July 25, 2016 (Doc. 5-1, p. 24/736).

## II.     Law and Analysis

### A.     Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio,

705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### B.   The ALJ considered all of the evidence before him, including the testimony of the VE.

Barnes contends the ALJ erred in failing to consider all the evidence (Doc 10). Specifically, Barnes contends the ALJ failed to consider all of the VE's testimony and adopt his finding that there are no jobs for a person who cannot work four days per month due to intermittent pain or anxiety, or for a person who cannot follow two step instructions.[3]

The ALJ did not need to consider the VE's responses to the hypotheticals concerning a person who cannot work four days per month or who cannot follow two step instructions, because he implicitly found those limitations did not apply to Barnes (Doc. 5-1, pp. 20-22/736).  Therefore, the ALJ did not err in his consideration of the VE's testimony.

### C.   The Appeals Council erred in failing to consider the new evidence submitted by Barnes.

Next, Barnes contends the Appeals Council erred in failing to consider his appeal, which was supported by additional evidence regarding PTSD and its effect on claimant's ability to work.  The medical evidence referred to by Barnes was from Kathryn Kelly, Ph.D., who evaluated Barnes for PTSD in June 2015 on behalf of the

---

[3] The administrative transcript omitted the VE"s answer to that question.  Barnes contends the VE said there would not be any jobs for a person who cannot follow two step instructions.

VA (Doc. 5-1, pp. 725-36/736).  Barnes contends that evidence was attached to his brief to the Appeals Council.  The medical report is dated June 2015, applies to the time period considered for Barnes's alleged disability, and is material to the allegation of disability due to PTSD and TBI.[4]

Accepting Barnes's allegation that he submitted Kathryn Kelly's report to the Appeals Council,[5] it appears the Appeals Council was unaware that new evidence had been submitted by Barnes.  The Appeals Council did not specifically acknowledge receipt or consideration of the new medical record or make a finding as to whether there was a reasonable probability that Dr. Kelly's record would have changed the ALJ's decision.  See 20 C.F.R. § 404.970(a)(5).  When the Appeals Council denies review after additional evidence has been submitted to it by the claimant, its denial notice must necessarily include language that specifically identifies the additional evidence.  See HALLEX 1-3-5-20(C)(4), "Consideration of Additional Evidence," available at https://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-20.html; see also Higginbotham v. Barnhart, 405 F.3d 332, 336 (5th Cir. 2005).  There is no evidence that either the ALJ or the Appeals Council reviewed Dr. Kelly's assessment of Barnes's PTSD.

---

[4] The alleged disability onset date is in January 2014, and the ALJ's decision is dated in July 2016.

[5] Moreover, the Commissioner accepts Barnes's allegation that he submitted Kelly's report to the Appeals Council with his brief (Doc. 11).

Evidence presented to the Appeals Council is part of the administrative record which is reviewable and should be considered by the court on review.  Higginbotham v. Barnhart, 405 F.3d 332, 337 (5th Cir. 2005).

The Appeals Council erred in failing to consider the new evidence before it or in failing to specify that it considered it.  SSA regulations require the Appeals Council to evaluate the entire record including the new and material evidence submitted. Higginbotham, 405 F.3d at 336.

However, procedural perfection in administrative proceedings is not required. See Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988).  Where the resulting disability determination remains unchanged, even if some of the reasoning underlying that decision is erroneous, no substantial rights have been affected.  The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time.  See Mays, 837 F.2d at 1364.  The procedural improprieties alleged by a claimant will constitute a basis for remand only if the improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.  See Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988); see also DeLeon v. Barnhart, 174 Fed. Appx. 201, 203 (5th Cir. 2006).

Dr. Kelly stated in her assessment that Barnes has moderate PTSD.  The Commissioner contends that Dr. Kelly's description of Barnes's degree of impairment is consistent with the ALJ's findings and decision (Doc. 11).

The ALJ reasoned as follows (Doc. 5-1, p. 22/736):

[C]laimant's allegations about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not entirely consistent with the objective evidence of record. …The record reflects the claimant was able, and did, work for several years while suffering from the ailments he now asserts are disabling.  Absent medical evidence of a change in the claimant's condition, the ability to work despite a pre-existing condition supports the undersigned's finding the claimant is not disabled. As such, the undersigned finds that the claimant's allegations

about the intensity, persistence, or functionally limiting effects of pain
or other symptoms are not entirely consistent with the objective
evidence of record.

The ALJ concluded that Barnes's PTSD/TBI symptoms have no more than a minimal

effect on his ability to do basic work activities (Doc. 5-1, p. 19/736).

In contrast, Dr. Kelly described Barnes as having an "[o]ccupational and social

impairment with occasional decrease in work efficiency and intermittent periods of

inability to perform occupational tasks, although generally functioning satisfactorily

with normal routine behavior, self-care and conversation."  Dr. Kelly clearly found

the symptoms of Barnes's PTSD and TBI will intermittently interfere with his ability

to work.  Had she not thought so, she would have checked "symptoms are not severe

enough either to interfere with occupational and social functioning or to require

continuous medication."   The VE testified there are no jobs for someone with

intermittent periods (up to four days per month) of inability to work due to anxiety

or pain (Doc. 5-1, p. 49/736).

The Commissioner also points out that Dr. Kelly could have selected worse

descriptions for Barnes's degree of impairment, but did not do so.  While that is

correct, she also did not select less severe descriptions, as demonstrated above.

Dr. Kelly found Barnes's moderate[6] PTSD/TBI symptoms affect his ability to

work consistently.  Dr. Cherry, the non-examining consultant relied on the by the

ALJ, also found that Barnes's ability to complete a normal workday and workweek

without interruptions from psychologically based symptoms is moderately limited,

---

[6] "Moderate limitation" is defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) as "[y]our
functioning in this area independently, appropriately , effectively, and on a sustained basis is fair."

and that his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is also moderately limited (Doc. 5-1, pp. 58-59/736). The ALJ's conclusion that Barnes' symptoms only a minimal effect on his ability to work is not supported by either Dr. Cherry's or Dr. Kelly's findings.

Since the ALJ and/or the Appeals Council failed to consider all of the evidence of record, the Commissioner's final decision is not supported by substantial evidence and is incorrect as a matter of law. However, this does not entitle Barnes to a decision in his favor based on the existing record. The record is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the national economy that Barnes can perform, given his true impairments. Therefore, Barnes's case should be remanded to the Commissioner for further proceedings.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Barnes's case be REMANDED to the Commissioner for further proceedings consistent with the views expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such

as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this 10th day of January, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge